UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO.: 04-10146-WGY |
| | ) | |
| v. | ) | |
| | ) | |
| ROBERT RAMOS | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The government files this sentencing memorandum to assist the Court in determining the appropriate sentence for Defendant Robert Ramos ("Defendant") in the above-captioned case. The factors the Court must consider in fashioning a sentence in this case are set forth at 18 U.S.C. §3553(a). Although this Court is not bound by the U.S. Sentencing Guidelines, it "must consult those Guidelines and take them into account when sentencing." United States v. Booker, 125 S.Ct. 738, 767 (2005). The government recognizes the applicable guidelines range under U.S. Sentencing Guidelines as presumptively reasonable. Accordingly, the government recommends that this Court sentence Defendant to 135 months imprisonment – the high of the applicable guidelines range in this case.

**A.    Nature and Circumstances of the Offense and History and Characteristics of the Defendant**

The nature and circumstances of the instant offense militate in favor of sentencing Defendant severely. As set forth below, Defendant recruited and paid another individual to commit murder. Defendant's intended victim was the mother and principal

1

caretaker of his then 2 ½ year old son.  Defendant's motive for this crime was mercenary – he did not want to continue making child support payments to his son's mother.  Defendant's crime was not an impulsive, impetuous act.  Defendant honed his murder-for-hire scheme over a period of several months, engaging in multiple conversations, communications and meetings with his hired hitman (also referred to as "CW") before giving him a $2,000 downpayment for the murder in December 2003.

In committing this crime, Defendant violated the public trust by recruiting an inmate under his care to commit the actual murder.  In addition, Defendant exhibited a chilling disregard for his son's well-being.  Defendant brought his son to a meeting with the hitman, went forward with his scheme despite the profound personal loss and trauma it would cause his son, and even authorized the hitman to kill his son's mother while his son was present.

### 1.  Extensive Planning

Defendant planned over a period of several months to have the mother of his child murdered.  He first approached the CW about it in early Summer 2003 while the CW was under Defendant's care, custody and control at the Bristol County House of Corrections.  The CW was subsequently released from that facility in July 2003.  In early September 2003, Defendant contacted the again CW about the murder-for-hire scheme.  Defendant exchanged

multiple telephone calls with the CW between September 2003 and December 9, 2003 when he handed the CW $2,000 in cash as partial payment for the murder.  During that time, Defendant had multiple telephone conversations with the CW in which he refined his murderous scheme and tried to ensure that his involvement in it was concealed.  Defendant drove from Massachusetts to Rhode Island at least two times during that period to meet with the CW in person to hammer out the details of his scheme and ensure its execution.  Throughout his prolonged scheming, Defendant evinced virtually no remorse, regret, reluctance, or misgivings about orchestrating the murder of his child's mother.

Defendant also gave careful thought to how best to conceal the fact that his intended victim was murdered.  He said that he had "lost hours and hours of sleep" over this.  (10/20/03:26).[1] He proposed that the hitman make the murder appear like a robbery.  (9/24/03:5-7; 10/20/03:23-25).  However, a robbery scene could be time-consuming to create.  Moreover, Defendant worried that his son's mother did not have many valuables that the hitman could steal to make the murder appear like a robbery that had gone awry.  (10/20/03:24).

Alternatively, Defendant proposed that the murder should

---

[1] Citations are to transcript dates and page numbers within those transcripts.  Thus, citation (10/20/03:26) refers to page 26 of the transcript dated 10/20/03.  Each of the cited transcripts, along with the recording on which it is based, has been filed with this Court under seal.

3

appear to be a drug overdose.  (9/24/03:7; 10/20/03:22).  He discussed where the hitman should inject his intended victim and discussed the logistics of finding a vein and restraining her while she was injected. (10/20/03:22-24).  Defendant also considered poisoning his victim.  (10/20/03:26).

After weighing the pros and cons of these various methodologies and cover stories, Defendant instructed the hitman to do "whatever is easiest for you to get the job done . . . just so you do the job completely." (10/20/03:33).  Defendant stressed that, however the hitman killed the mother of Defendant's son, "it'd have to look like it didn't come from me.  That's all I'm really worried about." (10/20/03:18).

Defendant also strategized about the best time to kill the mother of his child.  He told the hitman in October 2003 that even "if I had the money right now I wouldn't want it done now . . . it's warm out . . windows are open . . . say like she yells." (10/20/14).  Instead, Defendant wanted to wait until the weather turned colder so that windows would be closed and people would be less likely to hear his victim scream when she was attacked. (10/20/14).

Defendant gave careful consideration to how best to conceal his involvement in his intended victim's murder.  He wanted to kill his child's mother himself.  (10/20/03:26).  However, recognizing that the police would naturally suspect him after the

murder, Defendant decided that it was better that his
fingerprints and clothing fibers not be found at the scene.
(10/20/03:26,33).  Defendant was concerned that, because he
shared custody of his son with his intended victim, some of his
clothing fibers could be transferred to his intended victim's
house through his contact with the boy.  (10/20/03:26).  He was
prepared to explain those findings away if confronted by
investigators after his intended victim was murdered.
(10/20/03:26).

        In the months preceding September 2003, Defendant
deliberately tried to make his interactions with the mother of
his child appear "all peachy" and to make sure that "everybody
sees it . . . the people that need to be seeing it. . . . I ain't
crazy when it comes to that."  (9/24/03:4).  Defendant
acknowledged that "before, [people] used to know that [he and the
mother of his child] used to bang heads, argue, right.  So the
last couple of months I mean her cousin 'oh youse two get along.'
'Oh yeah, you know, everything's cool.'  But, that's how I am."
(10/20/03:9).  Defendant said he was now "swallowing" his
resentment toward and many grievances with his intended victim.
(9/24/03:5).  He explained that he was "playing the role,"
"playing stupid" in order to deflect suspicion from himself for
the murder.  (10/20/03:9).

        Defendant believed that his reaction upon learning of

intended victim's death would be a critical aspect of deflecting suspicion from himself.  Defendant said he would be "cry for happiness" when the mother of his child was killed, but he was mindful of the need to appear distraught about her death. (10/20/03:21).  He laughed about going to the wake. (10/20/03:21).  Defendant told the CW not to advise him of the exact date of the murder so that Defendant could appear surprised when he learned of it.  (10/20/03:30).

Defendant was also concerned about links that could be found between himself and the hitman.  (10/20/03:29).  Anticipating that he and possibly the hitman would be questioned by investigators, Defendant prepared plausible explanations for his telephone contact with the hitman, and developed protocols by which the extent of that telephone contact would be concealed. (9/24/03:8-9, 15-16; 10/20/03:30,33; 12/09/03).  He also planned to sever all communication between himself and the hitman after the murder to ensure that investigators drew no connection between them.  (12/09/03).

### 2.  Financial Motivation

Orchestrating the murder of another individual is a heinous crime on its face.  The heinousness of that crime is compounded in this case because Defendant's intended victim was the mother and principal caretaker of Defendant's then 2 ½ year old son. Defendant's expressed motivation for this crime was resentment

over having to pay child support to the mother of his child and
his belief that his intended victim was "playing" him
financially. (10/20/03:20). Defendant talked to the hitman
extensively about his intended victim's finances, remarking that
"she just wants to fuck me over and make me pay the highest
percentage" in child support. (10/20/03:7). He belabored his
account of how much money he believed his child's mother was
making under the table. He complained that she was making "way
more" money than he, but that he was still obligated to make
child support payments to her. (10/20/03:20-22,7,24). Simply
put, Defendant resented the fact that "this bitch has altered my
life" (10/20/03:21) and was fed up with her "cramping my style."
(9/24/03:4).

### 3.  Abuse of Public Trust

Defendant's status as a correctional officer makes his
criminal conduct in this case all the more egregious. As a
correctional officer of longstanding, Defendant was responsible
for upholding and exhibiting respect for the law. Defendant
abandoned those responsibilities by hiring a hitman to kill the
mother of his child. Defendant compounded his abuse of the
public trust by capitalizing on his position as a correctional
officer to facilitate his murder-for-hire scheme. Defendant's
used his official position to gain access to an inmate who was in
his custody, care and control and to recruit that inmate to

commit the actual murder.  In so doing, Defendant tried to induce that inmate, through the promise of financial reward, not only to violate the law, but to escalate his own criminal conduct beyond that in which he had previously engaged.

### 4.  Callous Indifference Toward Son

Defendant consistently exhibited a chilling coldness concerning the impact that this intended murder would have on his young son.  For example, in discussing the specifics of when and how to murder the mother of his child, Defendant explained that he had no problem with his son being in the house when the murder occurred.  (10/20/03:21)  Because Defendant picked his son up for visitations on Sundays and Tuesdays, he preferred that his intended victim's murder take place on a Saturday "just so the kid's not going to starve to death."  (10/20/03:35).  Defendant assured the hitman that his son could "hang a few hours if he's crying" after his mother is murdered.  (10/20/03:19).  When the hitman told the Defendant that he "wouldn't do nothing in front of [your son]," the Defendant's only focus was on whether his 2 ½ year old son would be able to identify the murderer, not on the depravity of leaving a toddler alone in a house for hours with his mother's dead body or the trauma and loss the child would suffer as a result of his mother's murder.  (10/20/03:21). Defendant's fleeting acknowledgment of the harm his murder-for-hire scheme would inflict on his son came when he asked the

hitman whether he would "have enough time, while my kid's screaming" to make the murder appear like a drug overdose. (10/20/03:22).  Defendant then corrected himself, saying that he didn't think "kids scream that much, I think they cry more." (10/20/03:22)

### 5.     Consistent with General Outlook and Psychological Makeup

In his conversations with the hitman, Defendant revealed how consistent his murder-for-hire scheme was with his general outlook and psychological makeup.  Defendant told the hitman that he (Defendant) was a "very revengeful" person and has "always been like that."  (10/20/03:8).  He boasted about how cunning he was in exacting his revenge, explaining that he "always attacked differently. . . . I'm the type of guy that will steal up on you in an alley.  You know what I'm saying?  But I'm like laid back so they think, oh, this guy's a sucker." (10/20/03:10).  He emphasized "that's how I am . . . You gotta think."  (10.20.03:10).

Defendant described himself as a "compassionate beast," explaining there were "a lot of people I hate . . . the one's I hate, I'm like, they tell me certain things . . . And like he'll smile, I'll smile.  You know what I mean, but deep down I'm saying I could take a bat to your fuck'n head; I'm looking right at him 'I could bash you' you know what I mean?  That is how, like, but I would say people would say, you know, 'you're so laid

back, you get along with everybody.' Yea you know but that is me
. . . When somebody gets cracked, that's how I am.  You know."
(10/20/03:19).

Defendant also recounted his days collecting gambling debts
in and around Fall River.  He explained how he would hire violent
individuals to threaten, intimidate and beat up the debtors.  He
instructed his debt collectors to confront the debtors and "bang
them out.  Then tell them the next guys that come over here
aren't gonna be as friendly as me, so you better come up with the
money."  (10/20/03:35).

Defendant recounted a specific incident where he sent two
debt collectors to a debtor's house and instructed them "as soon
as you see him, crack him, smack him down, maybe maybe break a
bone or two. . . . I says yeah and you tell him I says the next
guys that come over here they're not gonna be as friendly as us.
If you're lucky even to live.  These are words, word for word. .
. . I told them, I says I don't want you to knock him out, I want
him to know it, to hear what you're saying."  (10/20/03:36-7).

**B.  Seriousness of the Offense; Promote Respect for the
    Law; Provide Just Punishment**

The seriousness of the instant offense cannot be overstated.
Defendant conceived of a plan to murder the mother of his child
and solicited a convicted felon who was then-incarcerated and
under Defendant's care to carry out the plan.  Defendant schemed
about this murder for a period of months, claiming to have

contacted a hitman in Florida to commit the murder prior to
negotiating the price he would pay the CW.  (9/24/03:2-3).
Defendant provided detailed information to the CW about the
location of his intended victim's house, the neighborhood
surrounding that residence, the layout of that residence, and the
location within that residence of the victim's bedroom and that
of his son.  He calculated the desired timetable for the murder
and developed plausible scenarios by which the murder could be
accomplished without raising suspicion about Defendant's
involvement.  (10/20/03:14-18).  Defendant repeatedly assured the
CW that he wanted his son's mother killed and urged the CW to "do
the job completely."  (10/20/03:33).  Defendant even went so far
as take out a $2,000 bank loan to use as partial payment to the
CW he hired to murder the mother of his child.

     The CW whom Defendant hired as a hitman was himself a
convicted felon with a lengthy criminal record.  Defendant had
known the CW for many years from the neighborhood and knew of the
CW's reputation for violence and record of criminal activity.
Defendant solicited the CW to commit this murder-for-hire while
the CW was serving time for his criminal activity.  Defendant
thus had every reason to believe that his hired hitman would
carry out Defendant's murder-for-hire scheme.  It was a mere
fortuity that the CW, notwithstanding his longstanding criminal
conduct, was himself so troubled by Defendant's scheme that he

reported it to law enforcement authorities and cooperated in this investigation.

The trauma that Defendant's criminal conduct inflicted on his intended victim and her son is inestimable. As set forth in the victim impact statement, "this crime is like a nightmare that never really ends." The victim's trust in others has been shattered. She lives in a perpetual state of fear. She has been unable to regain a sense of normalcy in her life and is consumed by a sense of impending harm and betrayal. Knowing Defendant's avowed penchant for revenge, she fears retribution upon his release from prison and cannot imagine feeling safe upon his release.

The trauma that Defendant's murder-for-hire scheme has inflicted on Defendant's son is incalculable. The child is too young to fully grasp the import and impact of his father's crime or to verbalize his reaction to it. Nonetheless, Defendant has left his son a burdensome legacy with which he will have to come to terms as he grows up, especially because Defendant's child support payments were his avowed reason for arranging to kill the child's mother. Given the seriousness of this offense in its own right, its devastating impact on his intended victim, his son, and the public by virtue of Defendant's abuse and betrayal of the public trust in carrying out his crime, a severe and substantial sentence is the only just punishment in this case.

**C.  Protect the Public from Further Crimes of the Defendant**

Throughout his planning and consummation of his murder-for-hire scheme, Defendant exhibited a chilling indifference to taking the life of the mother of his child.  Even after pleading guilty to these charges, Defendant continues to exhibit a profound lack of appreciation for the seriousness of his crime and a disturbing lack of remorse in connection with it.  In his interviews with Drs. Daignault and Clark, Defendant repeatedly tried to rationalize and justify his criminal conduct, citing his intended victim's harassment of him, negativity toward him, lack of compliance with respect to custody, continued financial demands, and generally unsympathetic and grudging attitude toward him.  He appears to shift the responsibility for his own criminal conduct from himself to his intended victim, declaring that "deep down she knows she went too far."  Defendant's insistence that he has "done more [time in jail] than I should have already" underscores his profound lack of recognition for the gravity of his crime.  (Psychiatric Evaluation Report of Dr. Andrew Clark at 7).  Given Defendant's lack of appreciation for the seriousness of his criminal conduct, lack of remorse concerning it, continued efforts to deflect responsibility for his crime and ongoing efforts to justify it, past history of violence and aggression toward others, and avowed tendency to conceal his anger and to plot his revenge against those he believes wronged him, there is

13

a compelling need to protect the public from further crimes of Defendant.

### D.  **Provide Defendant with Needed Educational or Vocational Training, Medical Care**

Defendant has no demonstrated need for educational or vocational training.  He graduated from high school and has been gainfully employed for decades.

Defendant also has no particularized need for medical care that cannot be adequately addressed at a federal correctional facility.  Even accepting Dr. Daignault's conclusion that Defendant suffers from a major depressive disorder for which he needs psychotherapeutic treatment and a psychopharmacological consult, his claim that Defendant "would [be] deprive[d] . . . of the opportunity to engage in th[at] treatment plan" is wholly unsubstantiated.  The Bureau of Prisons routinely provides mental health treatment to federal inmates.  Dr. Daignault identifies nothing unique or exceptional about Defendant's mental profile that would render the Bureau of Prisons unable to provide the mental health services and medications Defendant requires.

Moreover, Dr. Daignault's diagnostic conclusions in this case are undercut by the fact that he neither reviewed nor relied on the audio and video recordings that were made of Defendant over a four-month period in which Defendant discussed and refined his murder-for-hire scheme.  Dr. Daignault thus ignored the only contemporaneous record of Defendant's mental condition and

14

cognitive functioning during the time period at issue in this case.  As such, his evaluation and diagnostic conclusions about Defendant's mental condition during that period are highly suspect.[2]

Defendant's conduct, statements and manner as reflected on those audio and video tapes stand in sharp contrast to Dr. Daignault's findings and conclusions about Defendant's mental condition and personal traits.  For example, Dr. Daignault's claim that "the instant matter was extremely anomalous conduct" for Defendant is belied by Defendant's account on October 20, 2003 of his violent efforts in the past to collect gambling debts and his description of himself as "revengeful," "attacking differently," and occupied with thoughts about violent attacks on others.  Dr. Daignault's conclusion that Defendant's "capacity to exercise rational thinking" was "substantially reduced" during the time in which he committed this offense is directly at odds with Defendant's detailed consideration of and strategic planning for his murder-for-hire scheme.  In sum, the October 20, 2003 videotape together with the many tape recordings and transcripts of Defendant's conversations and meetings with the CW over a

---

[2]  Dr. Daignault's conclusions are all the more suspect because his evaluation relied on a "[d]escription of alleged offense conduct authored by Mr. Ramos."  Defense counsel has represented to the government that he does not know what that document is and that he was unable to obtain a copy of it or to determine its contents after contacting Dr. Daignault for that information.

15

four-month period show Defendant to have been rational, strategic, engaged, conversational, calculating, motivated and determined throughout the period in which he engaged in his murder-for-hire scheme.

The Psychiatric Evaluation Report prepared by Dr. Clark refutes Dr. Daignault's claim that Defendant suffered from a major depressive disorder during the time period at issue in this case and that any such disorder contributed substantially to Defendant's commission of the offense in this case.[3]  The

---

[3]  Defendant has not moved for a downward departure based on his claimed diminished capacity, but he appears to be laying the groundwork for such a motion.  The government contends that a downward departure is not warranted in this case.  As set forth above, this Court should not credit the findings and conclusions of the  defense expert's evaluation of Defendant.  Even if the Court were inclined to give the defense expert's report some weight, that report acknowledges that Defendant "admits he was aware his conduct was wrong."  (Daignault Report at 5).  The report goes on to say that Defendant "felt unable to control himself at that point, tearfully explaining that he needed some kind of relief and wanted the issue finished."  However, this claim is belied by the protracted nature of Defendant's murder-for-hire scheme.  Defendant first spoke with the CW about killing the mother of his child in early Summer 2003 and, by his own admission, had decided to go forward with this scheme "around August 2003."  (Daignault Report at 4-5).  Yet, Defendant continued to refine and work out the logistics of his murder-for-hire scheme until December 9, 2003.  In October 2003, Defendant told the CW that he did not want his intended victim killed until the weather got colder because by that time the victim's neighbors would likely have shut their windows and would therefore be less likely to hear her scream when the CW attacked her.  Thus, Defendant's own admissions confirm his ability to control his behavior and to delay the murder of his intended victim for strategic and opportunistic purposes.  In addition, a downward departure is unwarranted in this case because §5K2.13(2) provides that the Court may not depart below the applicable guidelines range if "the facts and circumstances of the

16

conclusory nature of Dr. Daignault's Forensic Psychological Evaluation of Defendant is evident when compared with that of Dr. Clark.[4]

### E.  Applicable Guidelines Range

Under the U.S. Sentencing Guidelines, Defendant's base offense level pursuant to §2E1.4 is 32.  Because Defendant capitalized on his position as a correctional officer at the Bristol County House of Corrections to facilitate his murder-for-hire scheme, a two-level upward adjustment is warranted pursuant to §3B1.3 for abuse of a position of trust.  A three-level downward adjustment is warranted pursuant to §3E1.1 for acceptance of responsibility.  Based on the foregoing, Defendant's total offense level is 31, with an applicable guidelines range of 108-135 for each count.  Title 18 U.S.C. §1958 provides for a maximum term of imprisonment of 10 years for this offense.  Pursuant to U.S.S.G. §5G1.2(d), because the statutory maximum in this case is less than the total punishment set forth in Defendant's applicable guidelines range, the sentence imposed on Defendant's counts of conviction shall run consecutively to the extent necessary to produce a combined

---

defendant's offense indicate a need to protect the public because the offense involved actual violence or a serious threat of violence."

[4]    A copy of Dr. Clark's Psychiatric Evaluation Report and Curriculum Vitae have been filed with this Court under seal.

sentence equal to the total punishment.  In other words, if the Court determines that a sentence of 135 months imprisonment is warranted in this case, the Sentencing Guidelines provide that the Court can run Defendant's sentences on his multiple counts of conviction consecutively to produce a sentence of 135 months imprisonment.

## CONCLUSION

Defendant's criminal conduct in this case was protracted, egregious and depraved.  He exhibited a callous disregard for the sanctity of human life, for his child's well-being, and for the trust the public placed in him as a correctional officer. Defendant's petty financial motives compound the shocking nature of his offense.  As demonstrated above, the violent, calculating and cold-hearted nature of this offense is consistent with Defendant's psychological make-up and past conduct as an enforcer for a gambling operation.  Defendant himself was well aware of the depraved and heinous nature of his murder-for-hire scheme, but he was indifferent to it – casually remarking that he would "take [his] chances on going to hell."  (10/20/03:22).

Given the nature and seriousness of this offense, Defendant's history and characteristics, the traumatic impact Defendant's criminal conduct had and continues to have on his intended victim and his son, the need to protect his intended victim and the public from further crimes of the Defendant, the

need for just punishment, and other relevant sentencing factors,

the government believes that a substantial and severe sentence is

warranted in this case.  Accordingly, the government recommends

that the Court impose a sentence of 135 months imprisonment – the

most severe sentence available in this case under the U.S.

Sentencing Guidelines.

                              Respectfully submitted,

                              MICHAEL J. SULLIVAN
                              United States Attorney

                        By:
                               /s/ Emily R. Schulman
                              EMILY R. SCHULMAN
                              Assistant U.S. Attorney

Dated: July 20, 2005

                    CERTIFICATE OF SERVICE

    I, Emily R. Schulman, hereby certify that I have served a
copy of the foregoing memorandum on Barry P. Wilson, Esq., 240
Commercial Street, Boston, MA 02109, by hand delivery this date.

                               /s/ Emily R. Schulman
                              EMILY R. SCHULMAN
                              Assistant U.S. Attorney

19