UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, </br></br> VS. </br></br> ROBERT RAMOS, </br> DEFENDANT. | Docket No. 04-10146-WGY |

### DEFENDANTS MOTION FOR DOWNWARD DEPARTURE

Defendant moves that the Court grant him a Downward Departure to level 14 for the reasons hearin stated.

### Total Offense Level

The defendant stands convicted of his plea of guilty to one count of use of interstate commerce facilities in commission of murder for hire, aiding/abetting; one count interstate travel in the commission of murder for hire, aiding/abetting; and interstate travel in the commission of murder for hire, aiding/abetting, all in violation of **18 U.S.C.§ 1958 and 18 U.S.C.§ 2**.

At the rule 11 hearing on the 11th January 2005, Mr. Ramos pled guilty by waiving indictment and pled guilty to all counts of a superseding information.

Accordingly, as was computed in the PreSentence Report, the calculations come out to a level 31 with a Criminal History Category I and places the defendant in a range of 108 to 135 months if the Court were to follow the suggested guidelines and not enter a Departure.

1

## Grounds for Downward Departure

1.) Diminished Capacity.

Pursuant to **U.S.S.G. § 5K2.31,** a defendant is entitled to a departure under diminished capacity if (1) the defendant committed the offense while suffering from significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributes substantially to the commission of the offense. Referring to the report of Dr. Daignault, there can be no doubt that both factors occurred and that Mr. Ramos is entitled to said such departure. In fact, one must ask why a man in his middle forties, who had never done anything wrong, all of a sudden engages in this bizarre conduct. There has to be some explanation as nothing in Mr. Ramos' background or prior life history would suggest that he would engage in conduct of this nature. One can only reach the conclusion that but for his diminished capacity this crime would have never occurred. It is ridiculous to not to see the obvious and reach the same conclusion as Dr. Daignault.

A look at Mr. Ramos' life up to the point of this action, his career in law enforcement, the overwhelming support he has received that is indicated by the letters and his having never been engaged in any prior criminal activity, the only conclusion to reach is that Mr. Ramos suffered from diminished capacity and is entitled to a departure pursuant to **U.S.S.G. § 5K2.13**. It should be appreciated that Dr. Clark also finds that Mr. Ramos had been experiencing a "number of stresses in his life" and what Dr. Clark fails to do is explain how a man who had never been involved in criminal activity, never abused alcohol/drugs, happens to engaged in activity that is contrary to every aspect of

2

his life prior to this point in time.[1] The only reasonable explanation is the one found by Dr. Daignault that Mr. Ramos was suffering from diminished capacity, and Dr. Clark fails to give any explanation as to why a man who has lived his life as Mr. Ramos had could engage in this kind of conduct. This type of conduct is clearly irrational unless he was suffering from a mental impairment. In fact, the situation can best be summed up in the words of Scott C. Rose, who has known Mr. Ramos for approximately twenty years and had been one of his Supervisors at the Dartmouth Jail over the last eight years.

Mr. Rose avers that Mr. Ramos is a decent, kind hearted, generous family man, a good man who was "pushed and pulled" over the previous three years to drastic and irrational behavior. Mr. Rose confirms many of the stresses being experienced by Mr. Ramos prior to the instant matter. According to Mr. Rose, everyone who knows Mr. Ramos knows what he has been going through for the past three years and realizes that it is not the thinking of a rational man. "I believe this was an act of a desperate man..." states Mr. Rose. "Investigation of this matter will show that he was driven into this and he is a good man". Mr. Rose, concludes "this is really and truly a good person with a clean record that deserves a second chance. He's been in Law Enforcement for thirteen years and he just made a mistake. Nobody got hurt so I believe the man deserves some leniency".

The above statement by Mr. Rose seems to place it all in the appropriate perspective and this must be contrasted with some of the conclusions of Dr. Clark. There is no question that at the time. When Mr. Ramos engaged in this horrible conduct, he was suffering from diminished capacity. Further, that diminished capacity is born out by the fact that on the day he was to pay the minuscule amount of $2,000.00 dollars as a

---

[1] Dr. Clark finds certain factors that indicate a major depressive episode but disregards them. (See attached). Further, he continually contradicts himself, i.e. "Although he was 'dragging' at work, he was still able to perform his duties as well as before." For further examples see page 5 of Dr. Clark's report.

3

down payment he withdrew the money from a bank and then delivered it to the "hit man". Not a very well planned out endeavor and seems to support that Mr. Ramos was not sophisticated but was emotionally impaired.

Considering the above, the recommendations of Dr. Daignault take into consideration the needs of society as well as the needs of Mr. Ramos. Further, Dr. Daignult has clearly stated that Mr. Ramos is not a threat to anyone in society and his recommendations should be followed so that Mr. Ramos can once again become a productive member of society. There is no question that this crime is a crime that is of a horrible nature, but, at the same time, there is no question that this crime never had an opportunity of succeeding as the informant was an individual who was always planning a scheme in order that he can maintain his criminal activity and always get reduced sentences as a result of making deals. No one can excuse the conduct of Mr. Ramos but when put in the proper perspective what is being requested here is the fair and equitable resolution of the matter, as well as the explanation of what occurred.

2. Aberrant Behavior

Pursuant to **U.S.S.G.§ 5K2.20** a Court may grant a Downward Departure if the following three criteria are met: The defendant committed a single criminal occurrence or single criminal transaction that (1) was committed without significant planning; (2) was of limited duration; and (3) represents a marked deviation by the defendant from an otherwise law-abiding life. A careful review of the facts will note that this was a single criminal transaction that occurred over a couple of months but only sporadically and over a limited duration and contrary to anything Mr. Ramos had ever engaged in prior to this time. Further, a careful review of the facts in this case will show that this was not a sophisticated endeavor and that is born out by the fact that Mr. Ramos paid the down payment, an insignificant amount for such a heinous act, in money he had withdrawn from his credit union that morning. Further, without excusing the conduct of Mr. Ramos, that this did not involve the potential for violence as the "hitman" was never intending to carry out this endeavor as was previously stated, was attempting to provide himself with a means to get out of any difficulty that was clearly going to arise as this individual is always engaged in anti social behavior. Again, this does not excuse Mr. Ramos' conduct

but is an explanation as to how things came about and not only shows the aberrant behavior but reinforces his vulnerability do to diminished capacity.

## Conclusion

If not for any one or more of the forgoing reasons, then in consideration of the totality of the circumstances, **United States v. Sklar, 920 F.2nd 107, 117 (1st. circuit 1990),** the Court should grant a Downward Departure to a level that would permit a sentence of probation with all of the conditions enunciated by Dr. Daignault in his report.

Respectfully submitted,
FOR THE DEFENDANT,

Barry P. Wilson
LAW OFFICES OF BARRY P. WILSON
240 Commercial Street
Suite 5A
Boston, MA. 02109
617 248 8979
617 523 8700 (Fax)
BBO#: 529680

Date 7/20/05

# DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS

## FOURTH EDITION

# DSM-IV-TR®

every day for at least 2 weeks), and clinically significant distress or impairment. The diagnosis **Depressive Disorder Not Otherwise Specified** may be appropriate for presentations of depressed mood with clinically significant impairment that do not meet criteria for duration or severity.

### Criteria for Major Depressive Episode

A. Five (or more) of the following symptoms have been present during the same 2-week period and represent a change from previous functioning; at least one of the symptoms is either (1) depressed mood or (2) loss of interest or pleasure.

   **Note:** Do not include symptoms that are clearly due to a general medical condition, or mood-incongruent delusions or hallucinations.

   (1) depressed mood most of the day, nearly every day, as indicated by either subjective report (e.g., feels sad or empty) or observation made by others (e.g., appears tearful).   **Note:** In children and adolescents, can be irritable mood.
   (2) markedly diminished interest or pleasure in all, or almost all, activities most of the day, nearly every day (as indicated by either subjective account or observation made by others)
   (3) significant weight loss when not dieting or weight gain (e.g., a change of more than 5% of body weight in a month), or decrease or increase in appetite nearly every day.   **Note:** In children, consider failure to make expected weight gains.
   (4) insomnia or hypersomnia nearly every day
   (5) psychomotor agitation or retardation nearly every day (observable by others, not merely subjective feelings of restlessness or being slowed down)
   (6) fatigue or loss of energy nearly every day
   (7) feelings of worthlessness or excessive or inappropriate guilt (which may be delusional) nearly every day (not merely self-reproach or guilt about being sick)
   (8) diminished ability to think or concentrate, or indecisiveness, nearly every day (either by subjective account or as observed by others)
   (9) recurrent thoughts of death (not just fear of dying), recurrent suicidal ideation without a specific plan, or a suicide attempt or a specific plan for committing suicide

B. The symptoms do not meet criteria for a Mixed Episode (see p. 365).

C. The symptoms cause clinically significant distress or impairment in social, occupational, or other important areas of functioning.

D. The symptoms are not due to the direct physiological effects of a substance (e.g., a drug of abuse, a medication) or a general medical condition (e.g., hypothyroidism).

E. The symptoms are not better accounted for by Bereavement, i.e., after the loss of a loved one, the symptoms persist for longer than 2 months or are characterized by marked functional impairment, morbid preoccupation with worthlessness, suicidal ideation, psychotic symptoms, or psychomotor retardation.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>)<br>VS. )<br>)<br>ROBERT RAMOS, )<br>DEFENDANT. ) | Docket No. 04-10146-WGY |

### CERTIFICATE OF SERVICE

I, Barry P. Wilson, hereby certify that I mailed a copy of the Defendants Motion for a Downward Departure to Emily Shulman, Assistant U.S. Attorney 1 Courthouse Way, Suite 9200 Boston, MA. 02210, postage prepaid.

Signed under pains and penalty of perjury.

Barry P. Wilson